# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOHERTY,<br><br>    Plaintiff,<br><br>  v.<br><br>MACARTHUR GROUP, INC., et al.,<br><br>    Defendants. | Case No. 8:22-cv-01402-DOC-KES<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge: Hon. David O. Carter |

Following a bench trial, the Court finds the following pursuant to Federal Rule of Civil Procedure 52(a)(1):

## I. FINDINGS OF FACT

1. Defendant MacArthur Group, Inc. ("MacArthur") is a Delaware corporation with its principal place of business in Orange County, California.

2. Defendant Miramar Health, LLC ("Miramar") is a Delaware limited liability company with its principal place of business in Orange County, California. Miramar is a subsidiary of MacArthur.

3. Miramar and MacArthur operate substance abuse and behavioral health treatment facilities.

4. Defendant Tom Sauer is an individual and citizen of the United States, residing in Orange County, California. He is the Chief Executive Officer of both MacArthur and Miramar.

5. MacArthur was formed in early 2018 and started out with the goal of pursuing acquisitions of existing treatment facilities. Trial Testimony ("TT"), Day 2, Vol. 2, at 53:8-10. MacArthur acquired Miramar's assets towards the end of 2019. *Id.* at 56:10-12.

6. Mr. Sauer and Plaintiff John Doherty ("Plaintiff") have known each other since their time at the United States Naval Academy and have remained friends ever since.

7. In or about October 2019, Mr. Sauer contacted Plaintiff because he was searching for investors to provide capital for MacArthur and Miramar.

8. Plaintiff and Mr. Sauer met in the summer of 2019, during which time they discussed the state of MacArthur's early operations. Plaintiff testified that he thought MacArthur was in a "growth sector" that could be very promising for "unlocking" the value of his family's properties in Pennsylvania. TT, Day 1, at 16:20-23. During this meeting, Mr. Sauer informed Plaintiff that he was not interested in opening a de novo treatment center and was only looking to pursue acquisitions of existing treatment centers such as Miramar at the time. *Id*. at 17:6-9.

9. Shortly after this meeting, in or about October 2019, Plaintiff loaned Mr. Sauer money to meet MacArthur's cashflow needs. These discussions were only with Mr. Sauer and did not involve anyone else at MacArthur or Miramar. *Id*. at 24:15. Plaintiff made a series of loans to Mr. Sauer from 2019 through 2021 totaling $1,253,800. This principal amount is not disputed by the Parties. Defendants have fully paid back the loan principal.

10. Specifically, from about October 21, 2019, through September of 2021, Plaintiff loaned Mr. Sauer and his companies:
   - $50,000 in or around October of 2019
   - $50,000 in or around January of 2020
   - $100,000 in or around February of 2020
   - $350,000 in or around March of 2020
   - $175,000 in or around June of 2020
   - $100,000 in or around July of 202
   - $100,000 in or around August of 2020
   - $100,000 in or around September of 2020
   - $200,000 in or around February of 2021
   - $23,000 in or around April of 2021
   - $5,800 in or around September of 2021

11. The loans totaled $1,253,800. The repayment terms of the different loans varied and changed over time. In several different loan agreements, on the principal amount loaned, Mr. Sauer ultimately agreed to pay twenty percent interest to Plaintiff. The Court previously dismissed Plaintiff's claims related to non-payment of the interest on the loans finding that the interest rate was usurious and unenforceable. *See* Dkt. 31.

12. Plaintiff refused Mr. Sauer's offers to obtain an equity interest in Defendants' businesses in exchange for the loans. TT, Day 2, Vol. 2, at 74:20-75:1; *see also* Trial Exhibit ("TE") 51.

13. Plaintiff testified that his family owned several properties in Pennsylvania that he wished to use in an expansion of Mr. Sauer's businesses. The properties are owned by Plaintiff's family's trust and consist of seven different buildings in Pennsylvania. Plaintiff and Mr. Sauer ultimately began planning to use an unspecified number of the buildings as unspecified types of treatment centers for Mr. Sauer's businesses. This plan was referred to as the "Pennsylvania Expansion" between Plaintiff and Mr. Sauer.

14. Beginning in a signed letter to Plaintiff dated January 9, 2020, Mr. Sauer acknowledged the "Pennsylvania Expansion" plan. *See* TE 21. The letter stated: "Finally, this letter affirms my commitment to expand MacArthur Group by opening de novo substance abuse treatment and behavioral health centers using your family's properties in Pennsylvania, beginning June 2020. In the unlikely event MacArthur Group either cannot or will not execute this expansion plan to your family's properties in Pennsylvania, you will have the option to purchase 3% of MacArthur for $1.00 and I will not be obligated to repay you the loan of $100,000 principal plus $10,000 in interest." TE 21.

15. In a signed letter to Plaintiff dated January 23, 2020, Mr. Sauer stated in part: "Finally, this letter reaffirms my commitment to expand MacArthur Group by opening de novo substance abuse treatment and behavioral health centers using your family's properties in Pennsylvania, beginning June 2020. In the unlikely event MacArthur Group either cannot or will not execute this expansion plan to at least one of your family's properties in Pennsylvania, you will have the option to purchase 6% of MacArthur for $1.00 and I will not be obligated to repay you the loans of $200,000 principal plus $20,000 in

interest." TE 9.

16. In a signed letter to Plaintiff dated March 9, 2020, Mr. Sauer stated in part: "Finally, this letter reaffirms my commitment to expand MacArthur Group by opening de novo substance abuse treatment and behavioral health centers using your family's properties in Pennsylvania. In the unlikely event MacArthur Group either cannot or will not execute this expansion plan to at least one of your family's properties in Pennsylvania, by admitting its first patient by 01April 2021, you (or your spouse) will have the option to receive a seat on the board of MacArthur Group that comes with an annual director salary of $200,000 for the following 30 years." TE 13.

17. In a signed letter to Plaintiff dated July 24, 2020, Mr. Sauer stated in part: "Additionally, this letter reaffirms my commitment to expand MacArthur Group by opening de novo substance abuse treatment and behavioral health centers using your family's properties in Pennsylvania, as described in my previous letter to you dated 09 March 2020. This includes your spouse's position on the board of directors and commensurate $300,000 annual salary in the event I become unable or unwilling to do fulfill the agreement." TE 13.

18. In a signed letter to Plaintiff dated September 14, 2020, Mr. Sauer stated in part: "Additionally, this letter reaffirms my commitment to expand MacArthur Group by opening de novo substance abuse treatment and behavioral health centers using your family's properties in Pennsylvania, as described in my previous letter to you dated 09 March 2020. This includes your spouse's position on the board of directors and commensurate $300,000 annual salary in the event I become unable or unwilling to do fulfill the

agreement." TE 13.

19. In signed letters dated in November 2020 and February 2021, Mr. Sauer reaffirmed his general commitment to expand MacArthur Group to Plaintiff's family's properties in Pennsylvania but did not include language about a board seat or salary for Plaintiff or his spouse. TE 13.

20. There is no written agreement or other writing setting out the details of the Pennsylvania Expansion plan to use Plaintiff's family properties, for example, specifying which properties would be used, how they would be used, how profits would be split, or if rent would be paid.

21. The letter dated January 9, 2020 and the subsequent writings about the expansion do not set forth any obligations relevant to the expansion and simply refer to the prospective site for the expansion as Plaintiff's "family properties." *See e.g.* TE 21. Even though Mr. Sauer identified specific property owned by Plaintiff's family that was more suitable to use as a treatment facility, Plaintiff and his family eventually directed Mr. Sauer to use the property located at 256 W. Montgomery Ave., Haverford, PA ("Montgomery Ave. Property") for the expansion. TT, Day 2, Vol. 2, at 77:2-78:12.

22. Mr. Sauer believed the decision to use the Montgomery Ave. Property was forced on him due to the amount of money he owed Plaintiff at the time and the dynamic of their relationship. *Id*. at 81:13-82:14.

23. The Montgomery Ave. property was held by a trust, with Plaintiff's brother, James Doherty listed as the trustee. *See* TE 56. At the time Plaintiff

discussed the expansion with Mr. Sauer, Plaintiff was fully aware that he did not have sole ownership of the property. TT, Day 2, Vol. 2, at 6:19 -7:6. Mr. Sauer was not aware of this. *Id.* at 73:2-9.

24. Plaintiff intended to give James Doherty a third of the profits from any planned facility opened on the Montgomery Ave. Property. TT, Day 1, at 62:17-63:4. This profit split was not written down. TT, Day 2, Vol. 1, at 13:20-23. Mr. Sauer never entered into any such agreement with James Doherty. Further, rent for the property was not determined and Mr. Sauer thought Defendants would purchase the property instead of renting. TT, Day 2, Vol. 2, at 83:25-86:8.

25. Plaintiff gave Defendants access to the Montgomery Ave. Property to explore the possibility of expansion. Defendants hired Ezekiel Honegger as a general contractor to make renovations on the Montgomery Ave. Property to determine if an expansion was feasible. Defendants paid Mr. Honegger's salary and paid for renovations to the Montgomery Ave. Property. TT, Day 2, Vol. 1, at 46:24-47:2; TT, Day 3, Vol. 2, at 40:1-8; s*ee* TE 53, at 1. When the renovation started, the property had only one occupied unit, and those tenants were able to live out their lease. TT, Day 2, Vol. 1, at 49:20-52:24.

26. Based on Mr. Honegger's representation to Mr. Sauer, the Montgomery Ave. Property was not in a condition to be used as a treatment facility. It would cost over a million dollars and take more than a year to get the Montgomery Ave. Property close to Pennsylvania licensure standards required to open a treatment facility. TT, Day 3, Vol. 1, at 23:6-21. Although Plaintiff may have done some renovations on the property, these renovations were not requested by Mr. Sauer or any of the Defendants.

7
FINDINGS OF FACT AND CONCLUSIONS OF LAW

27. The Montgomery Ave. Property was zoned only for residential use. Defendants were informed that they would need a use variance to set up one of their facilities there. They were also informed by a zoning officer that a use variance "is a most difficult variance to obtain." Plaintiff was aware of this critical zoning issue as far back as July 2020. *See* TE 30, at 3; TE 32. Plaintiff later required that Mr. Honegger vacate the Montgomery Ave. Property once he realized that the site could not be used for the expansion. *See* TE 27, at 1.

28. Plaintiff testified that at the time of trial there were still no tenants in the Montgomery Ave. Property because his brother was too busy to rent it out. There was no concrete evidence presented on rent lost directly attributable to renovations of the property or the expansion plan.

29. On March 9, 2020, Plaintiff substituted the equity purchase option from the January 2020 letters with an option (for him or his spouse) to receive a seat on MacArthur's board at a salary of $200,000 per year for 30 years. *See* TE 21, at 4. Plaintiff drafted this letter. TT, Day 3, Vol. 2, at 36:25-37:2. There is no evidence that Plaintiff ever exercised this option. At trial, Mr. Sauer testified that he was not sure if MacArthur's sitting board of directors would approve Plaintiff's board seat. TT., Day 3, Vol. 1, at 11:25-12:6.

30. Plaintiff admitted that his family could have unilaterally stopped Defendants' expansion into Pennsylvania, which would have still entitled him or his wife to a board seat for 30 years and the associated salary. TT, Day 2, Vol. 2, p. 18:9-16. Plaintiff also intended to split this salary with his brother James. TT., Day 2, Vol. 1, at 24:4-10.

31. On March 10, 2020, in an email, Plaintiff admitted "the board position that I'm being offered is not expected to entail much work beyond letting you know where to send my check once a year" and "I think it's fair to say that this amount of money exceeds the actual value of my advice." Plaintiff also stated "I'm offering access to capital in exchange for your services as a real estate developer for my own properties. If you don't succeed in that effort, I get essentially an annuity in the guise of a board seat." *See* TE 24, at 1.

32. Plaintiff testified that he "didn't want to formally be on the board" due to the perceived animus in the local Pennsylvania community towards his family. TT., Day 2, Vol. 1, at 104:3-7.  Plaintiff wrote a letter addressed to Mr. Sauer and copied members of MacArthur's board. However, Plaintiff did not list his own name as a member of the board. *See* TE 54, at 18; TT, Day 2, Vol. 2, at 31:12-24.

33. On July 24, 2020, Plaintiff changed the salary for the supposed board seat to $300,000 per year for 30 years. However, this letter only mentions a board seat for Plaintiff's wife. Plaintiff later changed the terms to include a board seat for himself at the same salary. *See* TE 23, at 1.

34. On October 16, 2021, Plaintiff sent Mr. Sauer a text saying "Well, I'm not sure if I'm on the board to be honest."  Mr. Sauer responded that the plan was for him not to be but to "stand up" the Montgomery Ave. facility instead. *See* TE 31, at 3. Plaintiff testified that he understood this to mean that Mr. Sauer would open a de novo treatment center where Plaintiff would receive a minimum yearly salary of $300,000.00. TT., Day 2, Vol. 1, at 88:1-8. There is no writing or evidence of an agreement to this effect.

35. In late 2019, Mr. Sauer learned about an opportunity to cater to veterans with substance use disorders through Ali Beheshti, the CEO of Defendants' billing company. Mr. Beheshti informed Mr. Sauer that his background as a veteran would significantly improve his chances of securing a contract with the Department of Veteran Affairs ("VA"). TT, Day 2, Vol. 2, at 64:25-65:18; 96:17-97:4. Miramar began catering to veterans with substance abuse and mental health issues just as Plaintiff began lending Defendants money.

36. TriWest Healthcare Alliance ("TriWest") is the regional administrator of veteran's health benefits for the VA on the west coast, and in the State of California. Mr. Sauer informed Plaintiff that there were many advantages to becoming a provider with TriWest. In working with TriWest, facilities would not need to do as much online marketing. Business development for a TriWest provider would be mainly through forming positive relationships with VA providers and staff. TT, Day 3, Vol. 1, at 7:8-8:11.

37. Mr. Sauer, by leveraging his background as a veteran, was key in securing a contract with TriWest. Plaintiff was not involved in securing the contract. The contracting process with TriWest usually takes 14 to 24 months. Defendants were able to secure the contract in 10 months. TT, Day 2, Vol. 2, at 97:5 -10. Plaintiff recognized that Mr. Sauer's customer service and efforts in sourcing veteran patients was key in getting Defendants on the "TriWest fast track." *See* TE 47, at 1.

38. In order to expand Defendants' business to Pennsylvania, Defendants would need to secure a separate contract with Optum (the regional administrator of veteran's health benefits for the VA in Pennsylvania) to provide the same treatment to veterans there. TT., Day 3, Vol. 1, at 12:9-13:4.

39. There is no evidence related to how long it would take to secure a contract with Optum, but based on the TriWest timeline, anything less than 10 months would likely be unrealistic. TT, Day 2, Vol. 2, at 97:5-10. Even without the Optum contract, it is clear from testimony offered at trial that the timeline for the placement of the first patient at Plaintiff's family's Montgomery Ave. facility was unreasonable. *Id*. at 71:2-8; T.T, Day 3, Vol. 1, at 21:8-22:4; *see* TE 21, at 3; *see also* TE 23, at 5. Plaintiff was aware that this timeline was unreasonable and unrealistic based on his knowledge of Miramar's operations at the time.

40. Mr. Sauer, in an email to Plaintiff on November 22, 2021, stated that Plaintiff's constant unilateral changes to the terms of the loans were untenable and that there was no offer of a board seat to Plaintiff. *See* TE 27, at 3.

41. During Plaintiff's involvement with Defendants, from 2019 through 2021, the TriWest Contract was the source of most of MacArthur's revenue. Plaintiff's expert testified that the amount collected was exceptionally high. TT., Day 4, Vol. 1, at 64:13-21. Given his background and prior relationship with VA staff, Mr. Sauer spearheaded most of the efforts to generate referrals from different VA health centers once MacArthur's TriWest contract was activated.

42. Defendants' efforts in generating referrals from VA providers were focused more on relationship building than traditional advertising. TT., Day 3, Vol. 1, at 54:16-55:7. Additionally, Defendants hired and paid Marwan Kallal to design, develop, and maintain a website for Miramar. Mr. Kallal also

worked on Search Engine Optimization to aid Defendants' marketing efforts. Mr. Kallal was also working on another project for Plaintiff. Defendants paid Mr. Kallal's salary.

43. Plaintiff was never an employee of Defendants. Plaintiff admitted that he was not "required" to work on behalf of Defendants but rather felt he was required to. Plaintiff testified that Mr. Sauer did not direct him to complete tasks on behalf of Defendants but that Mr. Sauer made implied requests for his work.

44. In forming his opinion on damages, Plaintiff's expert, Mr. Greenstein believed that Plaintiff had worked at least 40 hours a week on behalf of Defendants. TT, Day 4, Vol. 1, at 44:15-45:5. However, Plaintiff testified that he spent about 10 hours per week working for Defendants beginning in January 2020. TT, Day 4, Vol. 2, at 25:2-8. From February 2021 to either April or May 2021, Plaintiff testified that he took 3 months leave from his job at the Massachusetts Institute of Technology (MIT) to work full-time assisting Defendants. Plaintiff then worked about ten hours per week for Defendants until November 2021.

45. After questioning from the Court, Plaintiff's expert stated that Plaintiff's work and ten hours per week schedule were akin to a "fractional CMO" (Chief Marketing Officer) who would earn a salary of $60,000 to $75,000 per year plus a bonus if they achieved their performance goals. TT, Day 4, Vol. 2, at16:1-20:1. There is no evidence that Plaintiff had any performance goals to support or justify a bonus.

46. Plaintiff and Defendants stipulated during trial that the average salary of a

marketing director in 2020 was $91,000 per year with a low of $24,000 and a high of $180,000. In 2022, the average salary was $93,000 with a high of $183,000 and no low provided. TT., Day 4, Vol. 2, at 22:25-23:13.

47. Plaintiff designed one marketing brochure for Defendants. Plaintiff testified that his work for Defendants also consisted of sending about 1000 emails to generate referrals, reading, attending meetings, and giving advice to Mr. Sauer based on his research. Plaintiff also directed Mr. Kallal's work. TT, Day 1, at 45:2-10. The extent of the supervision or direction of Mr. Kallal by Plaintiff is unclear. Plaintiff at least directed Mr. Kallal to write a web script to fill in search results of VA providers to more easily reach out to providers for referrals. TT., Day 2, Vol. 1, at 68:22-69:9; *See* TE 14 (b). Further, Plaintiff repeatedly asserted that he is entitled to compensation similar to that outlined in the "Feniks Marketing Agreement." There is no evidence that this agreement was ever signed, that Plaintiff performed the type of services contemplated by the agreement, or that the agreement is otherwise applicable to Plaintiff's services. *See* TE 37.

48. There was no reliable evidence presented to determine if Defendants directly profited from Plaintiff's marketing work and if so, what the amount of profits was or what a reasonable measure of the profits might be.

49. Plaintiff repeatedly testified that his goals in doing business with Defendants were to provide help to his friend Mr. Sauer and put his family's properties to good use to earn money. Plaintiff also testified that he contributed work to the businesses to try to make Defendants successful and profitable in order to ensure his loans were repaid.

50. Defendants retained other marketing firms to help generate leads for referrals. Mr. Sauer and other staff at Miramar and MacArthur negotiated and executed these contracts. TT, Day 2, Vol. 1, at 69:20-25.

51. By Plaintiff's own admission, Mr. Sauer would contact VA staff to generate leads. TT., Day 1, at 53:2-3. Although Plaintiff sent a large number of draft emails to VA staff, when it came to directly engaging with the VA, that was almost entirely done by Mr. Sauer. TT., Day 3, Vol. 1, at 52:22-53:4.

52. Defendants also received money from other outside lenders from 2019 through 2021. Mr. Sauer had a preexisting relationship with these outside lenders through his background as a veteran and his time at the Naval Academy. These outside loans amounted to $750,000, and all these lenders were fully paid back. TT., Day 3, Vol. 1, at 92:16-93:90; *See* TE 55.

53. On or about November 21, 2021, Tom Sauer informed Plaintiff that he and his businesses would not proceed with the expansion into Pennsylvania.

## II. **CONCLUSIONS OF LAW**

54. Plaintiffs' only remaining claims that were tried to the Court are promissory estoppel based on the promise to expand Defendants' businesses to Pennsylvania and unjust enrichment based on services rendered. *See* Dkt. 31. The Court previously dismissed with prejudice Plaintiff's claims based on unpaid interest holding that the interest rate was usurious and unenforceable *See* Dkt. 31. The Court also dismissed with prejudice Plaintiff's claims alleging that the Pennsylvania expansion documents were valid contracts because there was no meeting of the minds on the terms of expansion and

the agreement to expand was not supported by consideration. *See* Dkt. 31. The Court reaffirms its prior holdings here.

55. The elements of a promissory estoppel claim are: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Flintco Pac., Inc. v. TEC Mgmt. Consultants, Inc.*, 1 Cal. App. 5th 727, 734 (2016).

56. Plaintiff fails to meet his burden on his promissory estoppel claim because there was no clear and unambiguous promise to expand Defendants' operations to Pennsylvania. Commitments to expand to Pennsylvania using Plaintiff's family's properties were too vague to be enforced. Essential terms of the expansion commitments were missing and indefinite. Therefore, there is no clear promise for the Court to enforce, only preliminary discussions. *U.S. Ecology Inc. v. State of California*, 129 Cal. App. 4th 887, 901 (2005); *Granadino v. Wells Fargo Bank, N.A.*, 236 Cal. App. 4th 411, 418(2015).

57. In addition to the reasons the Court stated in its Order on the Motion to Dismiss (Dkt. 31), there is no enforceable agreement for the Pennsylvania expansion because the preliminary discussions were not formalized into writing as required by the Statute of Frauds and the obligations were impossible to perform. The letters relevant to the expansion fail to identify the property. *See* TE 21, 23 and 25. There was no meeting of minds even though Defendants explored the possibility of an expansion. *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 215(2006).

58. Plaintiff's alleged reliance on the expansion commitments was unreasonable

because he was aware of zoning restrictions on the property that would preclude Defendants from opening facilities there. *See* TE 30, at 3; TE 32. *Granadino*, 236 Cal. App. 4th at 418.

59. In addition to the Court's reasons in its Order on the Motion to Dismiss (Dkt. 31), the alleged promise to give Plaintiff a seat on MacArthur's board for 30 years at $300,000 per year is not enforceable because it is a facially unconscionable liquidated damages provision to enforce a real estate transaction with a purely speculative value. *Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305,1314 (2005). Further, Plaintiff, by his own admission could unilaterally stop the expansion and force Defendants to pay him the purported board seat salary. TT., Day 2, Vol. 2, at 18:9-16. Moreover, it was not a promise of a board seat, but rather, a potential option for Plaintiff to exercise. *See* TE 21, at 4.

60. The promises upon which Plaintiff's claim for promissory estoppel is based are also not enforceable because the scope of duty and limits of performance are not sufficiently defined to provide a rational basis for the assessment of damages. *Ladas v. California State Auto. Ass'n* (1993) 19 Cal. App. 4th 761, 770.

61. Plaintiff argues that he designed a marketing program and prepared properties in Pennsylvania in reliance on Defendants' promises to expand. First, the evidence does not support that Plaintiff's marketing work was in reliance on the promises but that Plaintiff worked so that Defendants' businesses were successful enough to ensure Plaintiff's loans were paid back. Second, Defendants paid for work done on properties in Pennsylvania. Regarding injury from Plaintiff's alleged reliance, the evidence shows that

16
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff's family's Pennsylvania properties are not vacant today due to the actions of Defendants or Plaintiff's reliance.

62. Plaintiff's showing of injury from the alleged reliance is speculative. Plaintiff's showing of the profits connected to his services including strategy and ideas for Defendants was unreliable and speculative.

63. Plaintiff cannot recover damages on his promissory estoppel claim because the evidence in support of his damages is entirely speculative. *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 694 (2004). Plaintiff's expert relied on incomplete, speculative, and irrelevant information in forming his opinion that the value of profits from Plaintiff's contributions was $4.5 million. TT, Day 4, Vol. 1, at 15:12-19; 19:3-4; 44:15-20; 57:12-59:15; 69:13-20; 71:18-72:2; 80:7-23. The Court only accepts Plaintiff's expert's testimony on comparable salaries for marketing directors.

64. A claim for unjust enrichment is a "quasi-contract claim" that seeks restitution where the parties' express contract is held to be unenforceable or ineffective for some reason. *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014). To recover on a claim for the reasonable value of services under a quantum meruit theory, a plaintiff must establish both that he or she was acting pursuant to either an express or implied request for services from the defendant and that the services rendered were intended to and did benefit the defendant. *Ochs v. PacifiCare of California*, 115 Cal. App. 4th 782, 794 (2004) (citing *Day v. Alta Bates Medical Center*, 98 Cal. App. 4th 243, 248 (2002)).

65. Plaintiff met his burden on his unjust enrichment claim because he rendered services for Defendants that were intended to benefit them and did benefit them under implied requests for his services. He did not receive compensation for his services.

66. Based on the hours that Plaintiff worked and the computation of a reasonable salary for that work according to Plaintiff's expert, the Court awards Plaintiff restitution under a quantum meruit theory. The Court awards Plaintiff a $60,000 annual salary or $5,000 per month for the period he worked 10 hours per week. The Court awards Plaintiff a $93,000 annual salary or $7,750 per month for the period Plaintiff worked full time. Plaintiff worked 10 hours per week during the 13 months from January 2020 to February 2021 and the 6 months from June 2021 through November 2021.[1] Plaintiff worked full time during the 4 months from February 2021 through May 2021 when he was on leave from his job at MIT. Accordingly, the Court awards Plaintiff $5,000 per month for 19 months which is $95,000. The Court awards Plaintiff $7,750 for 4 months which is $31,000. In total, the Court awards Plaintiff $126,000 ($95,000 plus $31,000) as compensation for services rendered to Defendants.

67. In determining the reasonable value of services, courts may consider agreed upon terms of an unenforceable contract. *George v. Double D Foods, Inc.*, 155 Cal. App. 3d 36, 42 (1984). Here, the Pennsylvania Expansion agreements do not provide a reasonable value for Plaintiff's services. A $300,000 salary for 30 years without working during those 30 years is not the reasonable value of Plaintiff's contributions during the January 2020 to

---

[1] During Plaintiff's testimony, he at first stated that he had worked ten hours per week for Defendants for two to three months. He later clarified and credibly corrected his testimony as reflected above.

November 2021 period.

68. To the extent that Plaintiff argues Defendants were unjustly enriched by his loans to them, the Court previously dismissed Plaintiff's unjust enrichment claim based on the loans (Dkt. 31) and finds Plaintiff has not met his burden on that issue at trial regardless. The Court is not capable of quantifying the impact of those loans or calculating damages based on the speculative profits that might be attributable to Plaintiff's loans. Moreover, the principal of the loans was fully repaid to Plaintiff. The interest on the loans was not repaid because it was held to be usurious by this Court.

69. Moreover, the Court declines to assign Plaintiff an equitable interest in Defendants' businesses because Plaintiff repeatedly turned down offers for equity from Mr. Sauer and damages based on this theory are speculative and not ascertainable. There is no evidence that Plaintiff expected to receive equity. Plaintiff asserts that he is owed more than a salary because he made large loans to save the company, but this argument again attempts to circumvent the Court's prior order dismissing claims based on the loan agreements and relies on a highly speculative damages theory.

IT IS SO ORDERED.

Dated: February 10, 2025

*David O. Carter*

Hon. David O. Carter